UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TRINA V. CALLO, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18-cv-04781 |
| | ) | |
| v. | ) | Judge Edmond E. Chang |
| | ) | |
| LOUIS DEJOY, Postmaster | ) | |
| General for the United States | ) | |
| Postal Service, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

Trina Callo brings this employment discrimination case against the United States Postal Service.[1] R. 1, Compl.[2] According to Callo, a supervisor at the Park Ridge Post Office has discriminated against her on the basis of her race in violation of Title VII, 42 U.S.C. § 2000e *et seq*., and on the basis of her disability in violation of the Rehabilitation Act, 29 U.S.C. § 791 *et seq*. The Postal Service has moved for summary judgment. R. 32. For the reasons explained below, the motion is denied in large part and granted only as to the hostile work environment claim based on race.

---

[1]The Court has federal question jurisdiction under 28 U.S.C. § 1331. The formal defendant is the Postmaster General, who is now Louis DeJoy. The Clerk's Office shall insert him as the new sole defendant. Fed. R. Civ. P. 25(d).

[2]Citations to the record are noted as "R." followed by the docket number, and when necessary, the page or paragraph number.

# I. Background

The facts narrated below are undisputed unless otherwise noted, in which case the evidence is viewed in Callo's favor.[3] Trina Callo works as a bulk-mail clerk at the United States Post Office in Park Ridge, Illinois. R. 34, DSOF ¶¶ 3, 5. Callo is a White woman, *id*. ¶ 5, and has worked at the Post Office for more than 35 years. DSOF, Exh. B, Callo Dep. Tr. at 11:6-8.

In January 2015, Callo lost almost all vision in her left eye. DSOF ¶ 6; PSOF ¶ 1. As a result of her eye condition, Callo "often becomes dizzy, disoriented, unbalanced, and suffers optical migraine headaches." PSOF ¶ 2. The condition has also affected her depth perception and peripheral vision, which causes her to "bump into and trip over things multiple times per day," as well as bump into people. *Id*. After she lost her vision, Callo spent three months at home without going into work. *Id*. In the meantime, Calmidy Winbush, an African-American woman, joined the Park Ridge facility as the "Officer in Charge," which is often referred to as an "OIC" for short. DSOF ¶¶ 7-9. Winbush would eventually be elevated to the position of "Postmaster." *Id*. ¶ 7. In any event, when Callo returned to work a few months later, she found that there was a new manager in the office. *Id*. ¶ 8. (It is not clear exactly when Callo returned to work, but the record suggests either April or May 2015. *See* Callo Dep. Tr. at 20:19-22.) On her first day back, Callo disclosed to Winbush that

---

[3]Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "DSOF" for the Defendant's Statement of Facts [R. 34]; "Pl. Resp. DSOF" for Callo's response to the Defendant's Statement of Facts [R. 36]; "PSOF" for Callo's Statement of Additional Facts [R. 37]; and "Def. Resp. PSOF" for Defendant's response to Callo's Statement of Additional Facts [R. 43].

she was blind in her left eye, PSOF ¶ 6, and there is no dispute that Winbush knew about Callo's vision condition, DSOF ¶ 53.

## A. Yelling Incident

The relationship between Callo and Winbush got off to a rocky start. According to Callo, at some point during her first week back, she was throwing box mail with a coworker, and the coworker questioned what they were doing, so Callo responded, "It always happens when a new OIC comes in. They start changing things." PSOF ¶ 7. At that moment, Winbush, who had apparently been within earshot, allegedly screamed at Callo, "I am the boss!" *Id*. Callo claims that she then responded, "What did I say wrong? Are you not the OIC?" *Id*. Winbush then turned around and walked away. *Id*.

According to Winbush, however, the trouble started when Winbush overheard Callo tell another coworker to "slow down so as to not complete her assignment too quickly." DSOF ¶ 13. Winbush then approached Callo and asked if there was anything Callo wanted to know about Winbush. *Id*. During that same exchange, Winbush emphasized to Callo that even though she was just an OIC, her instructions still needed to be followed. *Id*. Callo denies that this entire episode ever happened. Pl. Resp. DSOF ¶ 13.

Around this same time, Winbush allegedly also overheard Callo saying things like "Who is she anyway," "She is just an OIC," and "How old is she anyway" in reference to Winbush. DSOF ¶ 11. Callo denies asking any of those questions. Similarly, Winbush claims that she overheard Callo making "racial" comments

"several times on the workroom floor." Def. Resp. PSOF ¶ 8. Callo again denies making any derogatory statements about Winbush to anybody. PSOF ¶ 8.

### B. Changes to Work Space and Work Duties

Meanwhile, Callo found that her work responsibilities had been shifted around. Previously, Callo was assigned to split her time between "flat sorting and letter sorting," which was performed while sitting down, and "parcel post," which required standing. PSOF ¶ 20. Shortly after Callo returned to work following her eye injury, Winbush reassigned Callo to work solely on parcel post. *Id*. This did not involve any change in pay. DSOF ¶ 21. But according to Callo, the parcel-post duties were difficult because she was required to stand in a "small space" with many other people "working and running around," which meant she was "constantly" bumping into other people. PSOF. ¶ 21. The bumping was exacerbated by her vision problems. *Id*. But when Callo told Winbush that her disability made it difficult for her to do parcel-post duties, Winbush allegedly said, "I don't care, do as you're told." *Id*. Three weeks later, though, Winbush ended-up moving Callo back to flat and letter sorting because it turned out that Callo was more productive at those duties than both employees who had been assigned to replace Callo. *Id*. ¶ 22.

Another incident that occurred shortly after Callo returned to work was what became known as the "wall of UBBM." PSOF ¶ 25. Specifically, Callo claims that tubs of undeliverable bulk business mail (thus the acronym UBBM) were strewn all around her work area about three to four times per week. *Id*. Mail would fall out of these tubs, which created a tripping hazard for Callo because of her disability. *Id*.

¶¶ 25, 27. According to Callo, Postal Service safety personnel from outside of the Park Ridge facility agreed that the UBBM tubs were a safety hazard. *Id*. ¶ 26. But when Callo explained the safety issue and asked Winbush to stop letting UBBM tubs accumulate next to Callo's work station, Winbush allegedly responded, "I don't care." *Id*. ¶ 27. It is not clear how long this UBBM mail problem lasted. Winbush, for her part, denies that the UBBM tubs were a tripping hazard. DSOF ¶ 24.

### C. Bumping Incident

A few months later, in November 2015, Callo bumped into Winbush ("bumped" in the sense of made physical contact, not just crossed paths). DSOF ¶ 14. The parties refer to this as the "bumping incident." *Id*. According to Winbush, what happened was that Callo bumped into her and did not apologize. *Id*. ¶ 15. When Winbush called Callo's name, Callo still did not react or turn around. *Id*. Winbush called Callo's name again, and this time, Callo did turn around. *Id*. Winbush told Callo that she bumped her, and Callo responded with either "I can't see" or "Sorry" and continued to walk away. *Id*.

Callo tells a very different story. According to Callo, Winbush walked up behind her on her left side, which is the side of her vision problems. Pl. Resp. DSOF ¶ 15. Callo, not realizing Winbush was there, turned around and accidentally bumped into Winbush's shoulder "lightly." *Id*. Winbush immediately "screamed" the phrase "You bumped me!" three times, all in front of around 30 other employees. *Id*. Callo responded, "I couldn't see, sorry." *Id*. Winbush, of course, denies screaming at Callo during this incident. Def. Resp. PSOF ¶ 9.

5

A few minutes after the bumping incident, Winbush asked Callo's supervisor, John Gattuso, to bring Callo into Winbush's office. DSOF ¶ 16. Winbush threatened to call the police. What happened during this meeting is again disputed. According to Winbush, she criticized Callo for failing to say "excuse me" after bumping into Winbush and threatened to call the police if Callo ever intentionally bumped into her again. *Id*. Winbush characterizes this meeting as a "conversation" about how there would be "zero workplace violence." Def. Resp. PSOF ¶ 11. Callo, however, maintains that the discussion was much less civil than that and that Winbush yelled at her: "Don't touch me!" Pl. Resp. DSOF ¶ 16. Callo also says that Winbush told her she would call the police if Callo ever touched her again. *Id*. Callo does not remember Winbush mentioning anything about Callo failing to say, "Excuse me." *Id*. Similarly, Callo claims that the meeting was purely punitive, because all Winbush did was yell at her and threaten to call the police, as opposed to make any effort to understand why Callo had bumped into her. *Id*. ¶ 17. In fact, Callo maintains that Winbush could not have honestly believed that Callo intentionally bumped into her, especially given that Winbush knew about Callo's vision problems. PSOF ¶ 12.

In any event, after the bumping incident, Winbush began standing "closely" behind Callo on Callo's left side and "glaring" at her. DSOF ¶ 25. Winbush only stopped doing this after Callo filed an EEO complaint. *Id*. According to Callo, Winbush chose to stand behind her intentionally in order to micromanage and harass her. PSOF ¶ 32.

**D. Overtime Incident**

Then, in December 2015, during the holiday season, Callo was allegedly denied overtime on nine separate occasions: November 17, December 1, December 2, December 4, December 5, December 10, December 12, December 20, and December 21. DSOF ¶ 32; PSOF ¶ 14. According to Callo, the overtime hours that should have been given to her were instead given to a less senior, non-disabled, African-American mail processing clerk named Latrice Garrett. DSOF ¶ 31. Indeed, Garrett was a "fairly new employee" at the time. PSOF ¶ 15. Specifically, on the nine days in question, Garrett worked 38.87 hours of overtime, while Callo worked 19.18 hours of overtime—a difference of 18.69 hours. DSOF ¶ 33. These hours should have been given to Callo instead, Callo argues, because the Collective Bargaining Agreement between the Post Office and Callo's union states in part: "When during the quarter the need for overtime arises, employees with the necessary skills having listed their names will be selected in order of their seniority on a rotating basis." PSOF ¶ 17.

That being said, Callo ultimately worked the fourth-highest number of overtime hours at the Park Ridge facility that holiday season. DSOF ¶ 34. The only people who worked more overtime than Callo were Tanisha Bailey, a non-disabled Black sales associate (192.27 hours); Garrett (139.21 hours); and Mark Eltman, a White sales associate with a disability (122.41 hours). *Id*. ¶¶ 35-37. Callo herself worked a total of 70.72 overtime hours that season. *Id*. ¶ 38. After that, the next highest overtime went to Michael Turner, a Black mail processing clerk with a disability (41.20 hours). *Id*. ¶ 39. What's more, the 2015 holiday season was actually

the highest number of overtime hours that Callo herself had ever worked; before that, she had never worked more than 60 hours of overtime. *Id*. ¶ 45.

It is undisputed that Callo took at least 29 sick days during the 2015 holiday season. DSOF ¶ 47; Pl. Resp. DSOF ¶ 47. (The government, though, maintains that she took 32 sick days. DSOF ¶ 47.) In contrast, Garrett only took three sick days during the same time period. *Id*. ¶ 48. Moreover, it is undisputed that on at least some occasions during the 2015 holiday season, Callo was offered the opportunity to work overtime, but she declined because she needed to go home to take care of her dogs. *Id*. ¶ 49. Callo clarifies, however, that none of those offers coincided with any of the nine days on which she was allegedly declined overtime. Pl. Resp. DSOF ¶ 49.

### E. AWOL Letter Incident

The friction continued into the new year. In January 2016, Callo was approved for leave under the Family and Medical Leave Act. PSOF ¶ 18. While Callo was on FMLA leave, Winbush sent Callo a letter about Callo's absences from work. DSOF ¶ 50. The parties refer to this as the "AWOL Letter." *Id*. In the AWOL Letter, Winbush noted that Callo had been absent from work for more than five days without submitting any medical documentation. *Id*. ¶ 51. The AWOL Letter then stated: "If you fail to submit acceptable documentation, your absences will be considered AWOL." *Id*. Despite the letter, Callo was never marked "AWOL." *Id*. ¶ 52. According to Callo, Winbush sent her the letter despite knowing that Callo was on FMLA leave because Winbush was trying to harass her. PSOF ¶ 19. Winbush disputes that; she

claims that she knew that Callo had been approved for leave, but was not aware that Callo was on leave at the time that she sent the letter. Def. Resp. PSOF ¶ 19.

### F. Other Allegations of Harassment

In addition to all of this, Callo also points to numerous other incidents of alleged harassment and discrimination, though she generally does not specify when these other incidents happened. In general, Callo claims that there have been too many instances to count where Winbush screamed at her for no legitimate reason. PSOF ¶ 33. According to Callo, Winbush yelled at her because Winbush allegedly does not believe that Callo's disability is legitimate and because Callo is White. *Id.* Winbush also apparently "harasses" Callo for her medical documentation. *Id.* ¶ 24. And then at other times, Winbush allegedly ignored Callo, saying, "I am not talking to you." *Id.* ¶ 23.

Callo also testified that after she returned to work and disclosed her disability to Winbush, Winbush followed her on the road one day when they were both driving and kept her high beams on the entire time. PSOF ¶ 23. On the subject of driving, Callo further claims that she complained to Winbush "numerous times" about a handicapped parking spot outside the Park Ridge Post Office, which was severely undersized and had fading lines. *Id.* ¶ 29. Because of Callo's vision problems, she had trouble parking in the spot every day. *Id.* According to Callo, Winbush did nothing in response to her complaints, and the spot was not repainted until 1½ years later. *Id.* ¶ 30. Even then, though, the proper signage was not installed, which meant non-handicapped people would often park in the space, and snow would sometimes get

plowed into it. *Id*. Finally, although this allegation does not involve Winbush, Callo also claims that one of her other supervisors, Barbara Ross, once parked illegally behind Callo's car when Callo was in the handicapped spot; when Callo asked Ross to move, Ross responded, "Why don't you get a real disability?" *Id*. ¶ 31. Finally, Callo brings up an example from March 2019, in which she applied for an open position to be a Vehicle Operations and Maintenance Assistant, and Winbush apparently challenged Callo's qualification for the position based on Callo's blindness, even though there were no stated qualifications for the position. *Id*. ¶¶ 34-35.

Aside from her disability, Callo also alleges that she was subjected to harassment for being White. For instance, Callo noticed that on one occasion, Winbush invited six African-American employees to eat birthday cake in her office, but did not invite the four White employees, including Callo. DSOF ¶ 54; PSOF ¶ 28. Callo also claims that Winbush allows two African-American custodians to "loaf" around the office, whereas Winbush calls out Callo for taking breaks. DSOF ¶ 26. That being said, it is undisputed that Callo has not observed Winbush harassing other White employees, nor has anyone at the Park Ridge facility made comments to Callo about her skin color. *Id*. ¶¶ 55-56.

### G. Procedural History

Based on all of this, Callo submitted a complaint of discrimination to the EEOC in March 2016. R. 37-3, PSOF, Exh. 3. The charge complained about the bumping incident, the overtime shortage, and the AWOL Letter:

> I am recently blind in left eye. She [Winbush] threatened to call police on me because I accidentally bumped into her. Hostile work environment. Multiple

10

> days she gave the junior clerk (Black) Latrice OT which should have gone to
> me. Causing a financial hardship she has also harassed me on my FMLA by
> sending AWOL letters when my FMLA is approved.

*Id*. Callo received a formal notice of right to sue in April 2018. R. 1-1 at 2. In July

2018, she filed this case against the Postal Service, alleging disability and race

discrimination. R. 1. The Postal Service has moved for summary judgment. R. 32.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating

summary judgment motions, courts must "view the facts and draw reasonable

inferences in the light most favorable to the" non-moving party. *Scott v. Harris*, 550

U.S. 372, 378 (2007) (cleaned up).[4] The Court "may not weigh conflicting evidence or

make credibility determinations," *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d

697, 704 (7th Cir. 2011) (cleaned up), and must consider only evidence that can "be

presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

The party seeking summary judgment has the initial burden of showing that there is

no genuine dispute and that they are entitled to judgment as a matter of law.

*Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex*

---

[4]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations,
and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*,
18 Journal of Appellate Practice and Process 143 (2017).

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

As mentioned above, Callo argues that she was subjected to race and disability discrimination in violation of Title VII and the Rehabilitation Act. Compl. ¶¶ 9, 14. Specifically, Callo clarifies in her response brief that she is bringing both a disparate treatment claim based on the December 2015 denial of overtime, as well as a hostile work environment claim based on everything else. R. 38, Pl. Resp. Br. at 9.

At the summary judgment stage, the Court views the evidence in the light most favorable to Callo and gives her the benefit of all reasonable inferences. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Under that standard, although the claims will not necessarily be winners in front of a jury, both the disparate treatment claim and the hostile work environment claim survive.

### A. Disparate Treatment

First up is the disparate treatment claim. To survive summary judgment on a Title VII disparate treatment claim, the "legal standard ... is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The inquiry under the Rehabilitation Act is essentially the same: Callo must show that (1) she was disabled; (2) she was qualified to perform essential

functions with or without reasonable accommodation; and (3) her disability was the "but for" cause of an adverse employment action. *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019). The Seventh Circuit has made clear that all relevant evidence must simply be considered "as a whole." *Ortiz*, 834 F.3d at 763. As a practical matter, though, there are two main avenues to establishing a disparate treatment claim.

The first option is for Callo to try to establish a *prima facie* case for discrimination, which requires her to show that (1) she is a member of a protected class; (2) her job performance met the Post Office's legitimate expectations; (3) she suffered an adverse employment action; and (4) the Post Office treated another similarly situated employee who was not a member of the protected class more favorably. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *LaRiviere v. Board of Trustees of Southern Ill. Univ.*, 926 F.3d 356, 360 (7th Cir. 2019). If Callo is able to establish a *prima facie* case, then the burden will shift to the Postal Service to provide a legitimate, nondiscriminatory reason for the adverse action. *Coleman v. Donahue*, 667 F.3d 835, 845 (7th Cir. 2012). If the Postal Service successfully rebuts Callo's *prima facie* case, then the burden will shift back to Callo, "who must present evidence that the stated reason is a pretext, which in turn permits an inference of unlawful discrimination." *Id.* (cleaned up). Alternatively, even if Callo cannot establish a *prima facie* case, she can still survive on this claim as long as she points to enough circumstantial evidence that would allow a reasonable jury to infer that a decision was attributable to discriminatory motivations. *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

13

Here, Callo premises her disparate treatment claim on a single set of events: the denial of overtime hours on nine days during the 2015 holiday season. The Postal Service makes two main arguments in response. First, the Postal Service argues that the denial of overtime did not rise to the level of an adverse employment action. Def. Br. at 8-10. Alternatively, even if there was an adverse employment action, the Postal Service argues that Callo still cannot prove to a reasonable jury that the denial of overtime was caused by any discriminatory motive. *Id.* at 11. For the reasons explained below, the Court rejects these arguments.

### 1. Adverse Employment Action

The government's first argument is that the denial of overtime in this case fails to rise to the level of an adverse employment action. For purposes of disparate treatment, Callo must show that she suffered a "materially adverse employment action," not merely a minor or even trivial one. *Kurtzhals v. Cty. of Dunn*, — F.3d —, 2020 WL 4580550, at *3 (7th Cir. Aug. 10, 2020) (cleaned up). "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *Id.* (cleaned up). To qualify as "adverse," an employment action requires something more than a mere inconvenience or a change in job responsibilities. *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 649 (7th Cir. 2011). Rather, materially adverse employment actions include "cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished." *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004) (cleaned up). "When overtime pay or premium pay is a significant and expected

14

part of an employee's annual earnings, denial of such pay may constitute an adverse employment action." *Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016).

According to the government, the lost overtime here was not a "significant and recurring part" of Callo's "total earnings." Def. Br. at 8. This is unpersuasive. For one, the record suggests that overtime *is* a recurring and expected part of Callo's earnings during the annual holiday season. Indeed, Callo herself received holiday overtime year after year. DSOF ¶ 46. And Callo testified that overtime was regularly available throughout the year for those who signed up for the overtime desired list, although the amount of overtime varied depending on mail volume and staffing levels. PSOF ¶ 14. *See also Kurtzhals*, 2020 WL 4580550, at *3 (denial of overtime was adverse action where "policy on his eligibility for overtime remained consistent" and "ability to earn overtime was not speculative or conditional").

The government also argues that the roughly 18 hours of lost overtime over the nine days in question (which is the difference between what Garrett worked and what Callo worked on those days) are not substantial enough to constitute an adverse employment action. *Id.* at 9. Specifically, the government attempts to reframe the 18 hours as less than one day of lost overtime, and then goes on to cite several cases suggesting that one or two days of lost overtime cannot support a disparate treatment claim. *See Rhodes v. IDOT*, 359 F.3d 498, 505 (7th Cir. 2004); *Lewis v. City of Chicago*, 496 F.3d 654, 653-54 (7th Cir. 2007); *Grady v. FCA US LLC*, 2017 WL 5896894, at *7 (N.D. Ill. Mar. 30, 2017). These cases are similarly unpersuasive. In *Rhodes*, for instance, the plaintiff was marked absent without pay for one day, which the Seventh

15

Circuit held was not enough to rise to the level of a "disciplinary suspension," in part because the absence "had only a negligible impact on her income, and did not cause her material harm." 359 F.3d at 505. That case certainly does not stand for the proposition that *any* relatively small income impact is not an adverse employment action.[5]

*Lewis* is somewhat more on point because it does deal with overtime pay specifically, but there, the Seventh Circuit emphasized that "overtime *can be* a significant and recurring part of an employee's total earnings similar to a recurring raise or it could be insignificant and nonrecurring like a discretionary bonus." 496 F.3d at 654 (emphasis added). The Seventh Circuit went on to hold that the employee *had* demonstrated a genuine issue of material fact on the question of whether her lost overtime counted as an adverse employment action. *Id*. It is puzzling for the government to imply that *Lewis* somehow stands for the rule that two days of lost overtime is never enough. Rather, *Lewis* emphasized that the question of whether lost overtime can be an adverse employment action is highly context-dependent. Finally, in *Grady*, the District Court did hold that "[d]enial of overtime twice does not amount to an adverse employment action." 2017 WL 5896894, at *7. In support, the court noted that "[t]wo days of overtime pay is not significant and there is no evidence

---

[5]This is not to say that the overtime value in this case is "negligible." To the extent that the government is implying that the value of the lost overtime (which the parties calculate as approximately $835, Pl. Resp. Br. at 12; Def. Reply Br. at 3) is insignificant, that is also not dispositive of whether the denial of overtime here was "substantial." In short, $835 is a lot of money to many people, and whether that value (coupled, of course, with all of the other factors mentioned in this section) is enough to constitute an adverse employment action is a question of fact for the jury.

that this was an expected part of plaintiff's employment," nor did the plaintiff "present any evidence that he was entitled to overtime." *Id*. But not only is this case not binding precedent, but here, Callo was denied overtime *nine* times, not two, and Callo *is* arguing that holiday overtime pay was an expected part of her employment and that she was entitled to it based on the Collective Bargaining Agreement. So, these cases are all distinguishable.

Finally, the government argues that the 18 hours of lost overtime must be put into context. Specifically, Callo worked 70 hours of overtime during the 2015 holiday season, which is more overtime than Callo had ever worked, and also, Callo had the fourth-highest overtime hours in the Park Ridge facility. Def. Br. at 10. This, the government asserts, does not count as a "material change in the employment relationship." *Id*. (citing *Lewis*, 496 F.3d at 654). Again, this argument is unpersuasive. Even if Callo received more overtime than most other Park Ridge employees, there is nothing in the record to suggest that the other employees were even vying for overtime, so the fact that Callo worked more hours than them does not mean she herself could not also have been denied overtime.

Similarly, the fact that Callo did receive overtime does not insulate the Postal Service if it denied her overtime based on discriminatory motives. It might very well be true that Callo received more overtime in 2015 than she ever received in previous years. But that is not the right inquiry. If the Postal Service denied her overtime, then they denied her overtime. The fact that she may have been "better off" in 2015 than in previous years does not change that fact. Indeed, as Callo points out, the 70-

hours argument ignores the fact that there is no data on how many *total* hours of overtime were available in 2015. If the total number was higher than in previous years, then in that context, 70 hours could actually represent a proportional decrease. The government, for its part, argues that the variability of the overtime from year to year cuts against Callo. Def. Reply Br. at 3. But the inquiry is not this rigid. The correct question, as dictated by the Seventh Circuit, is whether the overtime in a particular employment scenario is more akin to a recurring raise or to a "more transient" discretionary bonus. *Lewis*, 496 F.3d at 653-54. There does not appear to be any blanket rule that the amount of overtime must be constant over time in order for a denial of overtime to constitute an adverse employment action.

Here, Callo has satisfied that burden; she has produced evidence that the Post Office maintains a year-round procedure for requesting and doling out overtime (even if the exact amount varies), and that she has in fact received holiday overtime from year to year. All of this suggests that the overtime in this case is more akin to a recurring aspect of Callo's compensation than to a transient, discretionary bonus.

For all these reasons, viewing the evidence in the light most favorable to Callo, the denial of overtime over the course of nine days in this case counts as an adverse employment action for summary judgment purposes.

### 2. Discriminatory Motive

But even if the denial of overtime counts as an adverse employment action, Callo still must prove that the decisions to deny her overtime on each of the nine days were motivated by some discriminatory animus toward her race or disability. As

mentioned earlier, Callo may try to establish a *prima facie* case of discrimination under the *McDonnell Douglas* burden-shifting framework, or she may simply try to argue that the evidence as a whole supports an inference of discrimination. *Ortiz*, 834 F.3d at 763. The Court will address both frameworks.

### a. Prima Facie Case

Starting with the burden-shifting framework, Callo argues that (1) she is White and disabled; (2) there is no evidence in the record that her job performance did not meet legitimate expectations; (3) the denial of overtime constituted an adverse employment action; and (4) Latrice Garrett, a non-White, non-disabled, similarly situated employee, was given more overtime than Callo. Pl. Resp. Br. at 11-14. The government does not challenge the first two elements, and, as explained above, Callo has sufficiently shown that the denial of overtime in this case was an adverse employment action, at least when all inferences are drawn in Callo's favor. That just leaves the question of the similarly situated employee, Garrett.

### i. Similarly Situated Employee

The Seventh Circuit has defined "similarly situated employee" to mean an individual who is directly comparable to the plaintiff in all important ways. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). To be sure, the other employee need not be *identical* to Callo, nor is there a "mechanical magic formula"—rather, the inquiry is "flexible, common-sense, and factual. It asks essentially, are there enough common features between the individuals to allow a meaningful comparison?" *Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 895 (7th

Cir. 2018) (cleaned up). Some common features are "whether the employees being compared (1) were supervised by the same person, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (cleaned up).

Here, Callo argues that Latrice Garrett—who was non-White, non-disabled, and received more overtime than Callo—was a similarly situated employee because both she and Garrett were full-time clerks under the same supervisor whose employment was governed by the same collective bargaining agreement. Pl. Resp. Br. at 14. In response, the Postal Service argues that this evidence proves nothing about whether the Post Office discriminated against Callo. First, the Postal Service argues that Callo is impermissibly cherry-picking Garrett as a comparator, while ignoring the other non-White, non-disabled coworkers who received *fewer* overtime hours than her. Def. Reply Br. at 5. Moreover, the Postal Service maintains that Garrett and Callo are not comparable because Callo used 32 sick days, whereas Garrett only used three sick days. *Id.* at 6.

As a general matter, the government is right that Callo must try to compare herself to a "representative sample of all workers who are comparable to her," and she is not allowed to just "pick and choose" the comparators who happen to support her claims. *Crawford v. Indiana Harbor Belt R. Co.*, 461 F.3d 844, 845 (7th Cir. 2006). At the same time, the Seventh Circuit has emphasized that it is important not to take the cherry-picking rule too far, because that would put plaintiffs "in a box: if they pick

just members of the comparison group who are comparable in every respect, they will be accused of cherry-picking; but if they look for a representative sample, they will unavoidably include some who were not comparable in every respect, but merely broadly comparable." *Id.* So the proper approach is somewhere in the middle. Callo must identify similarly situated employees who are comparable in all material respects. *Id.*

Here, the government accuses Callo of cherry-picking because Callo only identifies Garrett, while ostensibly ignoring the other non-White, non-disabled coworkers who received *less* overtime than her. Def. Reply Br. at 5. But the government does not provide any information on whether those other coworkers are genuinely comparable to Callo in all material ways. For instance, it seems like there were around four non-White, non-disabled coworkers (Mechong Bae, Harish Patel, Aleasha Miller, and Jasmine Barrientos) who received less overtime than Callo; yet, all of them were sales-and-service distribution associates, whereas Callo and Garrett were both mail-processing clerks. DSOF ¶¶ 35-44. The government does not offer evidence on whether distribution associates would have had the same supervisors or been subject to the same overtime standards as mail-processing clerks. And more importantly, as Callo mentions, there is no record evidence that the other employees engaged in the same conduct as her—that is, specifically requested overtime that was then denied. Pl. Resp. Br. at 13. Instead, the record does not show whether those other employees even added themselves to the overtime desire list, or whether they

had voluntarily declined overtime. Without that information, it is not clear that Callo has necessarily ignored comparable employees who were treated worse than her.[6]

The government also argues that Garrett is not a proper comparator because Garrett only took three sick days during the holiday season, whereas Callo took as many as 32 sick days (though Callo maintains she took 29). Def. Reply Br. at 7. Here, the government cites three out-of-circuit district court cases in support of the proposition that differing sick-day usage might undermine a finding of being similarly situated. *See Diamantoulis v. Quest Communications, Inc.*, 2010 WL 11515201 (D. Ariz. July 1, 2010); *Harris v. Potter*, 2007 WL 2994368 (E.D. Mo. Oct. 10, 2007); *Hill v. Napolitano*, 2012 WL 651438 (W.D. Tex. Feb. 28, 2012). These cases are not on point. In *Diamantoulis*, the difference in sick-day usage meant that the plaintiff and comparator "were not similarly situated in terms of their availability to accrue overtime hours." 2010 WL 11515201 at *7. Here, by contrast, there is nothing in the record to suggest that there was any sort of availability difference on the *nine specific days* in question; in fact, Callo specifically contends that she did not take sick days or decline overtime on any of the nine days. Pl. Resp. DSOF ¶ 49; PSOF ¶ 14. Similarly, *Harris* does not apply because the plaintiff there was a part-time flexible worker, whereas her comparators were both full-time workers. 2007 WL 2994368 at *4. The government argues that that is precisely the point; full-time workers have

---

[6]The government also suggests that one of Callo's White, disabled coworkers, Mark Eltman, received *more* overtime than Callo. Def. Br. at 13. But this is also unavailing. Just because the Post Office might have treated one White, disabled coworker well is not necessarily dispositive of whether the Post Office discriminated against Callo because of those same traits. This might make a persuasive point with the jury, but at the summary judgment stage, the evidence must be viewed in Callo's favor.

more availability to accrue overtime than part-time workers. Def. Reply Br. at 7. But that is not what *Harris* says; rather, the court there emphasized that the full-time workers were not comparable because they could sign up for the overtime-desired list, whereas part-time workers could not, the implication being that the full-time workers were as a baseline matter more entitled to overtime than the part-time plaintiff. *Harris*, 2007 WL 2994368 at *4. Here, by contrast, both Callo and Garrett are presumably full-time workers who are equally entitled to request overtime via the overtime-desired list. And as far as the record shows, there is no relationship between the number of sick days an employee takes and whether or not that employee is allowed to add her name to the overtime-desired list and make herself available for the distribution of overtime. Finally, *Hill* is not applicable either because "it was precisely [the plaintiff's] extensive absenteeism and refusal to provide documentation to support the leave without pay that is alleged to have resulted in the treatment to which she objects." 2012 WL 651438 at *6. There is no suggestion in this record that Callo's sick days—even if she took more of them than Garrett—resulted in any sort of disciplinary issues that might have served as a basis for denying her certain work benefits, like overtime.

Here, Callo has put forth enough evidence to show that a similarly situated non-White and non-disabled coworker, Garrett, received more overtime than Callo on the nine days in question—even though Callo requested overtime on those days, was senior to Garret, and should have received the overtime under the collective

23

bargaining agreement. Thus, Callo has established a *prima facie* case for disparate treatment based on the denial of overtime during the 2015 holiday season.

### ii. Non-Discriminatory Explanation

Because Callo has put forth a *prima facie* case for discrimination, it is now up to the government to supply a legitimate, non-discriminatory explanation for the denial of overtime. The government fails to do so. Here, the language in the Collective Bargaining Agreement is clear: "When during the quarter the need for overtime arises, employees with the necessary skills having listed their names will be selected in order of their *seniority* on a rotating basis." PSOF ¶ 17 (emphasis added). The record shows that Callo was much more senior than Garrett. So, on each of those nine days, Callo should have been offered overtime first, and if Callo declined, then Garrett could be offered overtime. But, viewing the evidence in the light most favorable to Callo, that is not what happened here, and the government does not explain why.

Instead, the only response that the government offers is that Callo took ten times as many sick days as Garrett. The problem is that Callo did not take a sick day on the nine days at issue and the government otherwise fails to link this to the Post Office's stated overtime policy, which is based on seniority alone. In other words, Callo has put forth evidence suggesting that the *only* way overtime was supposed to be doled out among Post Office employees was on a rotational basis rooted in seniority. PSOF ¶ 17. As far as the record shows, there was not a sick-day or absenteeism exception to the seniority policy, as in, if a senior employee took more sick days than a junior employee, then the junior employee would get priority for

24

overtime. Nor does the government suggest that there was even any informal practice of punishing employees for taking too many sick days by skipping over them in the overtime rotation. In fact, the government does not even offer any evidence to suggest that Callo acted improperly when she took 32 sick days. As far as the record shows, she accrued a certain number of sick days and used them.

In short, the government fails to provide any explanation for why Callo was denied overtime on the nine dates in question, even though she was more senior than Garrett. Nothing about the differing sick-day usage sheds any light on why the Post Office did not simply apply the seniority policy on those nine days. So, viewing the evidence in the light most favorable to Callo, the disparate treatment claim survives.

### b. Circumstantial Evidence

Alternatively, even if there is a flaw in the application of the *McDonell Douglas* framework, Callo has still made out a case for discriminatory motive based purely on the circumstantial evidence as a whole (viewed, of course, in the light most favorable to Callo). Quite simply, as explained above, Callo has produced evidence that the overtime assignment policy is supposed to be based on seniority. PSOF ¶ 17. And the Postal Service has simply not provided a direct explanation for why the seniority policy was not applied on those nine days. Coupled with all of the other evidence (discussed below) of the disability-based harassment that Callo experienced from her supervisors, there is enough here to support an inference that Callo was denied overtime on those nine occasions based on some sort of discriminatory animus against either her disability or her race or both.

This is ultimately a close call, but when all of the evidence is viewed in the light most favorable to Callo, there is enough here to survive summary judgment. To be clear, the jury at trial will not be bound by the same favorable standard and will instead be free to interpret the evidence however it wishes. Moreover, Callo will bear the burden of proof at trial and will be required to reconstruct the decision-making processes on the nine days in question. Under those circumstances, it may very well be that any potential evidence of discriminatory motive will be outweighed by the fact that Callo received more overtime than she herself had ever received, as well as more overtime than most of the other employees in the Park Ridge facility. Moreover, given the fact that Callo is only challenging nine days, the jury might even find that the overtime discrepancy can be chalked up to unintentional error in what is likely a busy workplace amidst the administrative challenge of figuring out overtime during the holiday season, as opposed to intentional discrimination. But for now, the standard requires viewing all of the evidence in the light most favorable to Callo. So the disparate treatment claim based on race and disability survives.

## B. Hostile Work Environment

Moving on from the disparate treatment claim, everything else in the record, Callo argues, is meant to support her hostile work environment claim on the basis of disability. Specifically, Callo identifies a number of incidents of alleged harassment to support this claim: (1) Winbush's "excessive and aggressive" reactions to innocent conduct by Callo; (2) the bumping incident; (3) Winbush's refusal to accommodate certain disability requests; (4) the AWOL letter; (5) the incident where Winbush

26

followed Callo in the car with her high beams on; (6) Winbush repeatedly asking for medical documentation; and (7) Winbush refusing to award Callo a job position based on a disingenuous concern that Callo's vision problems made her unqualified. Pl. Resp. Br. at 16. In addition, although she does not separate these allegations out from her disability-based allegations, Callo also cites a few examples that appear to support a claim for hostile work environment based on race: (1) Winbush believing that Callo did not like Winbush because of Winbush's race; and (2) Winbush's alleged favoritism for African-American employees. *Id.* at 15-16. For the reasons explained below, Callo has also put forth enough evidence to support a hostile work environment claim based on disability, so that claim shall survive.

### 1. Failure to Plead

As a threshold matter, the government argues that Callo never pleaded a hostile work environment claim in her Complaint, so Callo should not be allowed to raise the claim now on summary judgment. Def. Reply Br. at 10-11 (citing *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (7th Cir. 2004)). In support, the government also points to a previous opinion issued by this Court, in which an employee failed to assert a hostile work environment claim in his complaint and was not allowed to add it in response to a motion for summary judgment. *See Bailey v. Brennan*, 2016 WL 4493452, *12 (N.D. Ill. Aug. 26, 2016).

But Callo did plead a hostile work environment in her Complaint. Although it is true that she never used the words "hostile work environment," she did allege that she "had issues with her treatment in her *work environment* which she believes was

due to her disability." Compl. ¶ 8 (emphasis added). *See also Jajeh v. County of Cook*, 678 F.3d 560, 567 (7th Cir.2012) (holding that a hostile work environment claim was pleaded even though the complaint did not use that term). In that same paragraph, she goes on to list four instances of being yelled at, being denied overtime, and being sent discipline-type letters. *Id.* Yes, the Complaint is sparse on details, but given the reference to the "work environment" and being yelled at, the Court did initially construe the first claim as being a hostile work environment claim based on disability. In contrast, the complaint in *Bailey* was much less open to interpretation; there, the plaintiff had explicitly alleged disparate treatment and retaliation and had left no room for a potential hostile work environment claim, nor did he present any examples that could be construed to support a hostile work environment claim. So, for purposes of this motion, the Complaint does contain a claim for hostile work environment based on disability.

## 2. Exhaustion

Next, the Postal Service argues that Callo failed to exhausted some of the allegations now advanced in support of her claims. In order to bring a claim under both Title VII and the Rehabilitation Act, a plaintiff must first exhaust all administrative remedies. *Teal v. Potter*, 559 F.3d 687, 691 (7th Cir. 2009) (explaining that claims brought under the Rehabilitation Act are subject to the exhaustion requirements outlined in Title VII). What that means is that Callo "cannot bring claims in a lawsuit that were not included in her EEOC charge." *Id.* (cleaned up). At the same time, "a Title VII plaintiff need not allege in an EEOC charge each and

every fact that combines to form the basis of each claim in her complaint." *Id.* (cleaned up). The inquiry is whether "there is a reasonable relationship between the allegations in the charge and those in the complaint, and the claim in the complaint could reasonably be expected to be discovered in the course of the EEOC's investigation." *Id.* at 692.

The Postal Service initially argued that several incidents—including the reassignment of duties, the bulk mail tubs, the handicapped parking space lines, the micromanaging, the ignoring, the driving with high beams on, and some instances of screaming—had not been exhausted and thus could not serve as the basis for any adverse employment action to support a discrimination claim. Def. Br. at 7-8. Callo clarified, however, that all of those incidents were alleged in support of the hostile work environment claim; she was not arguing that any of those incidents on their own counted as adverse employment actions. Pl. Resp. Br. at 9. With that understanding, the government does not try to argue that Callo has failed to exhaust her hostile work environment claim. (Her EEOC charge does include specific reference to "hostile work environment," bolstered by specific examples and the identification of Winbush. *See* PSOF, Exh. 3.) Rather, the government's sole argument on this point is that Callo never pleaded a hostile work environment claim in her Complaint, so she is not now allowed to add the claim at summary judgment. But for the reasons discussed above, Callo *has* pleaded a hostile work environment claim. Other than that, the government appears to concede that Callo is free to "rely on facts not mentioned in the complaint to support the claims that are in the

29

complaint." Def. Reply Br. at 10. So, Callo is free to rely on facts not mentioned in the Complaint to support her hostile work environment claim, which is in the Complaint.

### 3. Merits of the Hostile Work Environment Claim

That brings us to the substance of the hostile work environment claim. To survive summary judgment here, Callo must show that: (1) she was subject to unwanted harassment; (2) the harassment was based on her race or disability; (3) the conduct was severe or pervasive so as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability. *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 834 (7th Cir. 2015); *Nichols v. Mich. City Plant Planning Dept.*, 755 F.3d 594, 600 (7th Cir. 2014). "A hostile work environment is one that is both objectively and subjectively offensive." *Tyburski v. City of Chicago*, 964 F.3d 590, 601 (7th Cir. 2020) (cleaned up). The hostile work environment inquiry depends on the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *see also Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018). Even "conduct that is not particularly severe but that is an incessant part of the workplace environment may, in the end, be pervasive enough and corrosive enough that it meets the standard for liability." *Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir. 2007).

The government asserts two main challenges to the hostile work environment claim. First, the government argues that there is no evidence of an objectively offensive environment. Def. Reply Br. at 12. The government also argues that the conduct being complained about was neither severe nor pervasive. *Id*. at 14. It is a close call, but the Court disagrees on both points.

Here, viewing the evidence in the light most favorable to Callo, the record suggests that Winbush was skeptical of Callo's disability. For instance, when Callo told Winbush that her disability made it difficult for her to perform the parcel-post work (after Winbush reassigned her), Winbush allegedly replied, "I don't care." PSOF ¶ 21. The response from Winbush was again "I don't care" when Callo raised her safety and visibility concerns about tripping over the bulk-mail tubs stacked in her work area. *Id*. ¶ 27. There is also the fact that Winbush refused to address the handicapped parking space for nearly 1½ years. *Id*. ¶¶ 29-30. More generally, Callo alleges that Winbush yelled at her on too many instances to count. *Id*. ¶ 33. Winbush also repeatedly asked Callo for her medical documentation and threatened to mark her as "AWOL" while Callo was on approved FMLA leave. *Id*. ¶ 19. In addition, Callo alleges that at least one other supervisor, Barbara Ross, blocked her car in while she was in the handicapped parking space and yelled at her to "get a real disability." *Id*. ¶ 31. All of this taken together supports an inference that Callo's supervisors were skeptical and perhaps even resentful of her disability.

That being said, the above conduct, standing alone, does not necessarily rise to the level of severe and pervasive harassment. *See Racicot v. Wal-Mart Stores, Inc.*,

414 F.3d 675, 678 (7th Cir. 2005) (occasional cursing, yelling, and vulgar language not enough to support hostile work environment claim). But Callo's allegations here go beyond just verbal conduct. For example, there was the November 2015 bumping incident. Drawing all inferences in favor of Callo, a jury could find that Callo accidentally bumped into Winbush when Winbush was standing behind Callo's left side; Callo apologized and explained that she could not see; and Callo was then called into Winbush's office, where Winbush yelled at her and threatened to call the police if she ever touched Winbush again. Pl. Resp. DSOF ¶ 16. Then, after the bumping incident, Callo claims that Winbush would frequently stand behind her on her left side, which is the side where Callo has vision problems and is precisely how the bumping incident first happened. According to Callo, this behavior was not only harassing, but it also posed a safety hazard given her disability and tendency to bump into people and trip. PSOF ¶ 32. Relatedly, there was also the incident where Winbush apparently drove closely behind Callo with her high beams on, which presumably made it difficult for Callo to see while driving. *Id*. ¶ 23.

The government denounces some of the allegations as "bizarre," Def. Br. at 7, but that is for a jury to decide. Viewing the evidence in the light most favorable to Callo, there is enough here to support an inference that Winbush (and potentially one other supervisor) was skeptical of the legitimacy of Callo's disability and, as a result, subjected her to pervasive harassment, including yelling, threatening to call the police, refusing to accommodate her disability-related requests, and attempting to

physically trip her up at work, whether by standing closely behind her or by refusing her requests to remove physical obstacles from her work space.

Taken together, this type of conduct goes beyond the "run of the mill uncouth behavior" that is typically insufficient to support a hostile work environment claim. *Racicot*, 414 F.3d at 678. To be clear, this is still a very close call. It is certainly possible that a jury analyzing the evidence as a whole will conclude that these instances were simply not severe or pervasive enough, nor objectively offensive enough, to justify a hostile work environment claim. But that is not the proper inquiry at this stage. Rather, for purposes of summary judgment, when all the evidence must be viewed in the light most favorable to Callo, there is sufficient evidence here to support Callo's hostile work environment claim on the basis of disability.

That being said, to the extent that Callo is attempting to assert a hostile work environment claim based on race, that must fail. Even when the evidence is viewed in the light most favorable to Callo, there is not enough circumstantial evidence to support an inference that any of the alleged harassment Callo suffered was motivated by the fact that she is White. Callo's theory here is that from the start, Winbush believed that Callo disliked Winbush because of Winbush's race. Pl. Resp. Br. at 15-16. Thus, everything that Winbush did to Callo after that was somehow defensively motivated by race. But there are no concrete facts on which to base this contention. Separately, Callo also alleges that Winbush outright favored African-American employees over White employees. The examples here are the birthday cake incident and the fact that Winbush allowed two Black custodians to "loaf" around the office,

while yelling at Callo for taking breaks. DSOF ¶¶ 26, 54. But neither of these one-off examples can support an inference of severe or pervasive harassment on the basis of race. Nor can Callo establish a hostile work environment claim by arguing that similarly situated non-White employees were treated better than her; *McDonnell Douglas* does not apply in this context. So this aspect of Callo's hostile work environment claim fails.

## IV. Conclusion

For the reasons stated above, the motion for summary judgment is denied in large part and granted in limited part. Callo has sufficiently established a claim for disparate treatment based on race and disability, as well as a hostile work environment claim based on disability. The hostile work environment claim based on race is dismissed. With this decision in place, the parties shall engage in good-faith settlement negotiations, starting with a written demand from Callo to the Postal Service by September 16, 2020. The government shall respond in writing by September 30, 2020. The parties shall file a written status report, including whether they want to convene a settlement conference (and if so, whether by this Court or a referral to the magistrate judge). The status hearing of September 25, 2020 is reset to October 9, 2020, at 8:30 a.m., but to track the case only (no appearance is required, the case will not be called).

ENTERED:

    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 3, 2020

34